E-FILED
Wednesday, 08 July, 2020  11:48:18 AM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | | |
|---|---|---|
| TERRELL W. BELL, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 19-cv-3066 |
| | ) | |
| ANDREW SAUL, Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Terrell W. Bell, Jr., appeals from the denial of his application for Social Security Disability Insurance Benefits (Disability Benefits) under Title II of the Social Security Act. 42 U.S.C. §§ 416(i) and 423. This appeal is brought pursuant to 42 U.S.C. § 405(g). Bell filed a Brief in Support of Motion for Summary Judgment (d/e 14). The Defendant Commissioner filed a Motion for Summary Affirmance (d/e 19). Bell also filed a Reply Brief to Defendant's Motion for Summary Affirmance (d/e 20). The parties consented to proceed before this Court. Consent to the Exercise of Jurisdiction by a United States Magistrate Judge and Reference Order

<u>entered August 14, 2019 (d/e 13)</u>.  For the reasons set forth below, this

Court affirms the Decision of the Commissioner.

<u>STATEMENT OF FACTS</u>

Bell was born November 22, 1972.  He earned a bachelor's degree in

college and previously worked as a waiter and bartender.  He stopped

working on August 1, 2013.  He suffered from degenerative disc disease of

the lumbar spine, status post bilateral knee surgeries, status post spinal

fusion surgery, and depression.  Bell also reported headaches and memory

loss.  Certified Transcript of Proceedings Before the Social Security

Administration (d/e 9) (R.) 15-17, 22, 33, 35, 38, 188, 255-57.

On August 20, 2013, Bell saw his primary care physician Dr. Divya

Batra, M.D., for low back pain.  His back had been hurting for two years.

He hurt his back picking up a keg.  He felt his back pull, his legs went numb

to the knees, and he "got sick."  The pain had been constant for four

months and radiated into his legs.  A 2010 MRI of Bell's lumbar spine

showed mild lumbar spondylosis with multilevel mild diffuse disc bulges;

small central disc protrusion at the L5-S1 level causing mild mass effect on

the thecal sac.  R. 269.

On examination, Bell had normal posture and gait; normal ability to

get on the examination table and to change positions smoothly; normal

range of motion in the neck; no tenderness in either the thoracic or the lumbar spine;  paraspinal muscle tenderness and tightness to palpation; and normal range of motion in his spine in his thoracolumbar and lumbosacral spine.  R. 270.  Dr. Batra recommended continuing ordinary activities with appropriate limits, stretching exercises, and the use of heat and ice.  She referred Bell to Dr. Howard Dedes, M.D., for a consult.  R. 270.

On September 11, 2013, Bell saw Dr. Dedes.  Dr. Dedes assessed lumbar spondylosis, back pain with radiation, and lumbar spinal stenosis. Dr. Dedes administered transforaminal lumbar epidural steroid injections at L4-L5 and L5-S1.  R. 261-62.  Dr. Dedes told Bell not to engage in any heavy lifting or bending until his follow up examination.  R. 263.

On June 9, 2014, Bell saw Dr. Batra for back pain.  Dr. Batra stated that an MRI of Bell's back from September 2013 showed disc protrusions at L4-L5 causing deformity of  the contiguous thecal sac; disc protrusion at L5-S1 abutting the contiguous thecal sac; mild central spinal stenosis at L4-L5, and disc bulge at L1-L2 causing mild deformity of the contiguous thecal sac.  Bell said he could not tolerate lumbar epidural steroid injections he received in 2013.  He also reported memory loss and that his symptoms

worsened in the last year.  He took time to remember most events.  He

denied any weakness in his arms or legs.  R. 255.

On examination, Bell had normal posture and gait, normal ability to

climb onto the examination table, normal ability to change positions

smoothly, normal range of motion in his neck, and no tenderness in his

thoracic spine.  Bell had normal range of motion in his lumbar spine, but

pain moving laterally and forward, and when rotating.  He had paraspinal

muscle tenderness and tightness on palpation.  Straight leg testing was

abnormal.  Dr. Batra assessed lumbar disc degeneration, not controlled;

and memory loss, acute, moderate.  Dr. Batra ordered an MRI of Bell's

lumbar spine and brain.  R. 257.

On January 9, 2015, Bell completed a Social Security Disability

Report form.  He stated that he suffered from rheumatoid arthritis in the

knee and degenerative disc disease in his back; he could not sit, stand, or

walk for long periods; he had a prolapsed disc in his back that stuck out a

quarter of an inch; he had leg numbness with a history of four surgeries on

his right knee and three on his left; and he had pain injections that made

his pain worse.  R.  187.[1]

---

[1] The table of contents of the records indicates that the Disability Report was dated January 9, 2015.  The July 30, 2015 Disability Report states that the prior Disability Report was dated January 6, 2015.  The Disability Reports, themselves, R. 186-93 and R. 213-18, are undated.

On March 17, 2015, Bell saw Dr. Batra. He reported the following as the reason for the visit:

> Patient reports he is having reoccurring back problems. Reports he hasn't been seen in over a year.
>
> Pt reports he has reoccurring low back pain. Reports the shots he had from Dr. Dedes made it worse last year. Pt reports the back pain has been worse in the last 6 months due to his job moving furniture.

R. 308.  Bell reported this episode of pain had been going on for a year and worsening over that time.  The pain was shooting and moderate and was aggravated by position and standing.  Bell had tried ice, NSAID medication, heat, muscle relaxants, and exercise.  Nothing worked.  On examination, Bell's cervical and thoracic back were normal.  Bell's lumbar spine had "decreased range of motion, tenderness, bony tenderness, swelling, pain and spasm."  R. 309.  Dr. Batra prescribed gabapentin and exercises, and she referred Bell to a neurosurgeon.  R. 310.

Bell did not have any reported wages in 2014 and 2015 on his Social Security FICA wage records.  See R. 177.   He received unemployment insurance in the fourth quarter of 2013 and the first quarter of 2014.  R. 179.

On April 25, 2015, Bell saw state agency physician Dr. Raymond Leung, M.D., for a consultative examination.  R. 301-07.  Dr. Leung noted

Bell had degenerative disc disease.  Bell stated that injections and physical

therapy did not help.  He had knee pain and reported four surgeries on his

right knee.  His pain medication for the knee helped and he did not use a

cane or walker.  Bell said he could walk a block and that he was on a five

pound lifting restriction.  He last worked in January 2015 as a truck driver.

R. 301.

On examination, Dr. Leung found that Bell was oriented, his memory

appeared intact, and his affect was within normal limits.  He walked with a

mild limp 50 feet unassisted; he tandem walked and hopped.  He could not

heel or toe walk.  He squatted three fourths of the way down and had

decreased range of motion in his right knee and lumbar spine.  Bell had no

atrophy or muscle spasms.  His pinch, arm, and grip strength were 5/5 and

his leg strength was 4+/5.  He had no difficulty getting on and off the

examination table.  At the end of the examination, Bell said that all the

information he gave Dr. Leung was accurate.  Dr. Leung assessed history

of disc protrusion at L4-L5 and L5-S1, disc bulge at L1-L2, and spinal

stenosis at L4-L5, with limited forward flexion of his lumbar spine; a history

of multiple right knee surgeries with reduced flexion of the right knee; and

he walked with a limp.  R. 303.  Bell, again, did not have any reported

wages in 2015 on his Social Security FICA wage records.  See R. 177.

On May 14, 2015, state agency physician Dr. David Mack, M.D., prepared a Physical Residual Functional Capacity Assessment.  R. 70-72. Dr. Mack opined that Bell could frequently lift 10 pounds and occasionally lift 20 pounds; sit for six hours in an eight-hour workday, stand and/or walk for six hours in an eight-hour workday; and frequently stoop, crouch, kneel, and crawl.  Dr. Mack found no other functional limitations.   R. 70-71.

On July 30, 2015, Bell completed another Disability Report form.  R. 213-18.  He reported that his mental and physical impairments were the same as his January 2015 Disability Report.  R. 214.

On September 14, 2015, state agency physician Dr. Yacob Gawo, M.D., prepared a Physical Residual Functional Capacity Assessment.  R. 80-83.  Dr. Gawo opined that Bell could frequently lift 10 pounds and occasionally lift 20 pounds; sit for six hours in an eight-hour workday, stand and/or walk for four hours in an eight-hour workday; occasionally climb ramps, stairs, ropes, ladders, and scaffolds; frequently balance; occasionally stoop, crouch, kneel, and crawl; should avoid all exposure to vibration; and should avoid concentrated exposure to extreme cold and hazards.  Dr. Gawo also opined that Bell was limited in his ability to push and pull with his right lower extremity.  R. 81-82.

On December 22, 2015, Bell saw Dr. Batra for back pain.  Dr. Batra had referred Bell twice to a neurosurgeon, but he did not follow up and make the appointments.  R. 314.  On examination, Bell had tenderness on palpation in his lumbar spine.  Straight leg raising and cross leg raising tests were negative.  Dr. Batra again referred Bell to a neurosurgeon.  R. 315.

On January 26, 2016, Bell saw nurse practitioner Anita Arnold, NP, in the offices of neurosurgeon Dr. Arden Reynolds, M.D.  R. 317-20.  Bell rated his pain as a 5/10.  Previous treatments did not help and his pain was worse with lifting, sitting for long periods of time, walking, and standing.  R. 317-18.  He had been a fighter since age 12 and participated in wrestling, boxing, taekwondo, and mixed martial arts (MMA).  As a result, he has had a history of fractured arms, fingers, legs, hands, and toes.   Arnold noted, "The patient is currently laid off. Previous work roofer."  R. 318.  The Social Security FICA wage records in the file end in 2015 and do not indicate whether he had wages reported in 2016.  R. 177.

On examination, Bell was oriented.  His recent and remote memory was intact and his muscle bulk was normal with no atrophy.  He had muscle spasms in his cervical and lumbar spine, and tightness in his thoracic spine.  His gait and tandem walk were normal.  The motor exam

showed strength ranging from 4/5 to 5/5 in the muscles of his extremities.

Arnold assessed back pain, neck pain, extremity weakness, small

protrusion at L5-S1.  Arnold ordered a cervical MRI and scheduled Bell to

see Dr. Reynolds.  R. 318-19.

On February 29, 2016,  Dr. Reynolds performed surgery on Bell's

neck.  R. 409-10.  The diagnosis was cervical stenosis with cord and root

compression, myelopathy and radiculopathy.  R. 409.

On April 13, 2016, Bell saw nurse practitioner Arnold for a six week

follow up after Bell's neck surgery.  He still had some pain, but the pain was

"manageable."  He was taking Norco, Flexeril, and gabapentin for the pain.

On examination, the incision was healing, and the swelling was improving.

Bell had cervical tightness without acute spasms.  His upper extremity

strength was improving, and his deltoid, biceps, triceps, and grips were

intact. His neuropathic pain was mild to minimal and his gait was steady.

Arnold told Bell to continue range of motion activities and begin taking 30-

minute walks daily.  Arnold imposed a weightlifting restriction of 30 to 40

pounds and said Bell should avoid ladders.  R. 327-28.

On May 31, 2016, Bell saw physical therapist Leah Whipple, Pt, DPT,

for physical therapy evaluation after his neck surgery.  On examination

strength in his upper extremities was 3+/5.  He had diminished sensation to

light touch:  absent in the fourth and fifth digits bilaterally and diminished along the anterior of the left upper extremity distal to the elbow.  Upon palpation, Bell had tenderness in his shoulder muscles and paraspinal muscles along the cervical spine.  R. 333.

On June 2, 2016, Bell saw physical therapist Whipple for neck pain, muscle weakness, deceased range of motion in his neck, and difficulties with activities of daily living. He reported difficulties with lifting, reaching overhead, gripping, and turning his head.  His pain level was 6/10 both before and after the physical therapy session.  R. 337.  Whipple gave Bell exercises to address his problems with his neck and noted that Bell partially reached his goals to be able to resume with lifting, reaching overhead, gripping, and turning his head.  Bell reported that he went to the gym to observe boxing and give coaching tips.  R. 338.

On June 6, 2016, Bell saw Dr. Batra.  He complained of depression and anxiety after his neck surgery.  He reported significant symptoms of depression, including crying episodes and difficulty sleeping.  He denied any suicidal ideations or agitation.  He also reported anxiety symptoms, but no chest pains or palpitations.  On examination, Bell's mood was sad, but his speech, thought process, and judgment were intact.  Dr. Batra prescribed Cymbalta.  R. 340-41.

On June 14, 2016, Bell saw physical therapist assistant Lori Vogel, PTA.  The pain in the back of his neck between his shoulder blades interfered with his sleep.  He did the prescribed exercises at home, but reported constant pain as he performed the exercises during the physical therapy session.  Vogel noted that Bell partially reached his goals to be able to resume with lifting, reaching overhead, gripping, and turning his head.  Bell reported that he went to the gym to observe boxing and give coaching tips.  R. 343-44.

On June 23, 2016, Bell saw physical therapist Leah Whipple.  Bell reported that he had not attended therapy sessions because of increased pain.  He rated his pain at 5/10 before the physical therapy session and 7/10 after.  R. 347.  Bell made good progress in improving the range of motion of his cervical spine.  His grip improved somewhat but not significantly.  Whipple noted that Bell partially reached his goals to be able to resume with lifting, reaching overhead, gripping, and turning his head.  Bell reported that he went to the gym to observe boxing and give coaching tips.  R. 348.

On June 30, 2016, Bell saw Dr. Batra for a follow-up on the effects of the Cymbalta prescription.  Bell tolerated the medicine well.  He felt better, but still had crying episodes and problems with sleep.  He denied any

suicidal thoughts or agitation.  On examination, Bell's mood was depressed but his speech, thought process, and judgment were intact.  Dr. Batra increased the dosage of Cymbalta and recommended counseling.  R. 351-52.

On July 18, 2016, Bell saw nurse practitioner Anita Arnold  for a three-month follow up after his neck surgery.  He was trying to wean off his Norco and was down to twice a day.  He had approximately six pills left and said that, "overall he has been doing well."  He was back in the gym, but he was not sparring.  He had neck stiffness and soreness at times and his balance was "iffy."  He had not fallen.  R. 354.

On examination, the scar had healed well.  Bell had mild cervical spasms.  His upper extremity muscles and grip were intact.  His gait was overall steady.  Arnold strongly encouraged Bell to increase his activity level, but to refrain from activities such as sparring.  R. 355.

On August 1, 2016, Bell saw Dr. Batra for a follow up on his depression and anxiety.  He reported a lot of pain.  Dr. Batra noted that nurse practitioner Arnold terminated Bell's Norco prescription.  Bell's mood and sleep were good.  He asked for a refill on the Norco prescription.  On examination, Bell's mood was stable and his speech, thought process, and

judgment were intact. R. 356-57. Dr. Batra renewed the Norco prescription. R. 357.

On November 7, 2016, Bell saw Dr. Batra for right calf pain. He had the pain for a week. On examination, Bell was positive for Homan's sign. [2] He also had tenderness on palpation of the anterior aspect of the right knee. Dr. Batra noted a cyst on the posterior of the right knee, possibly a Baker's cyst.[3] Dr. Batra prescribed Motrin. R. 364-65.

On December 5, 2016, Bell saw Dr. Jeffrey Wells, D.O. Dr. Wells worked with Dr. Batra. Bell saw Dr. Wells for a refill of his Norco prescription. R. 370. On examination, Bell's grip strength was 5/5, his upper and lower extremity strength was 5/5, he had no sensory or motor deficits, and his straight leg testing was negative. Dr. Wells refilled his prescriptions. R. 371.

On December 16, 2016, Bell saw physician's assistant Jon Humiston for an initial consultation for right knee pain. Bell reported that walking long distances and deep knee bends aggravated the pain and he rated the pain as 6/10. An ultrasound noted a cyst on his knee. Bell had prior knee surgeries to remove lipomas. R. 429. On examination, Bell had no pain on

---

[2] Homan's sign is a clinical test for deep vein thrombosis. See Dorland's Illustrated Medical Dictionary (32[d] ed. 2012) (Dorland's), at 1712.
[3] A Baker's cyst is swelling behind the knee and is caused by the escape of synovial fluid that becomes enclosed in a membranous sac. Dorland's, at 458.

active or passive range of motion of the right knee.  The cyst was mildly

tender to palpation.  He had tenderness on the medial and lateral joint

lines.  Straight leg testing was negative.  Bell had normal mood, affect,

speech, and behavior and x-rays showed no fracture or dislocation.

Humiston assessed right knee pain with fluid-filled collection thought to be

Baker's cyst.  Humiston recommended an MRI of the knee.  R. 433-34.

On February 3, 2017, Dr. George Crickard, M.D., performed right

knee arthroscopy on Bell.  R. 513-14.

On February 14, 2017, Bell saw Dr. Crickard for a follow-up after his

right knee arthroscopy.  He was not in any pain and was ambulating

without difficulty.  He said his knee never felt better.  R. 470.  On

examination, Bell had no tenderness, normal range of motion, and normal

strength in both knees.  R. 471.

On February 27, 2017, Bell saw Dr. Batra.  Bell's mood had improved

and he had no suicidal thoughts or agitation.  His mood and sleep were

good.  On examination, Bell's mood was stable, and his speech, thought

process, and judgment were intact.  He had mild tenderness on palpation

of the cervical spine.  R. 476-77.

On June 4, 2017, Dr. Batra completed a form entitled  Medical

Source Statement of Ability to Do Work Related Activity (Physical).  R. 502-

05.  Dr. Batra opined that Bell could occasionally and frequently carry less than 10 pounds, sit for less than two hours in an eight-hour workday, stand and walk for less than two hours in an eight-hour workday, sit for 15 to 20 minutes before having to change positions, and stand for 15 to 20 minutes before having to change positions.  Dr. Batra opined that Bell needed to walk around several times a day for 15 to 20 minutes each time, lie down three to four times a day during an eight-hour workday, and shift positions at will from standing to sitting.  Dr. Batra stated that Bell was so limited due to cervical pain and low back pain.  R. 502.  Dr. Batra opined that Bell could occasionally stoop and climb stairs, but he could never climb ladders, crouch, or twist.   The reasons were low back pain and cervical pain and tenderness.  Dr. Batra said that Bell could occasionally reach and handle, constantly finger and feel, and never push or pull with any extremity.  R. 503.  Dr. Batra stated Bell should also avoid extreme cold and he was also limited in crawling, kneeling, and balancing, but she did not explain the nature of the limitations.  R. 504.  Dr. Batra opined that Bell would miss more than four days of work a month if he went back to work, he would be off-task more than 25 percent of the time at work, and he would need to take more than 5 additional unscheduled breaks at work, each lasting 15 to

20 minutes due to pain/paresthesias, and numbness.  Dr. Batra did not opine on when Bell's disability began.  R. 504.

THE EVIDENTIARY HEARING

On June 14, 2017, an Administrative Law Judge (ALJ) conducted an evidentiary hearing in this case.  R. 28-65.  Bell appeared with his attorney.  Vocational expert Barbara Myers appeared by telephone.  R. 30.

Bell testified first.  He last worked as a bartender and also engaged in MMA fighting and training as a hobby.  He did not get paid to train others in MMA fighting.  R. 33.  After he was injured in August of 2013, he went to the gym about twice a week for an hour to 90 minutes.  R. 36.  He no longer sparred, but did "walk throughs."  Bell described walk throughs, "You just tell people what position and where dominant position is.  You don't get on the mat; you don't roll with them."  R. 34.  Bell did walk throughs of jujitsu positions.  R. 36.

At the time of the hearing, Bell was separated from his wife.  He had one child, an adult daughter, and lived with his sister and her husband.  His sister supported him, and he received Food Stamps and Medicaid.  R. 37-38.

Bell said he had headaches three to four times a day.  Each headache lasted for an hour to an hour and a half.  He was light sensitive

and lay down when he had headaches.  He also vomited once or twice a day when he had headaches.  He took hydrocodone, gabapentin, diclofenac, Cymbalta, and cyclobenzaprine for his headaches.  R. 38-39.

Bell testified that he could not turn his neck, "It pinches and pops," and "Shoots pain through my ear and my head."  He could not turn his head as turning his head caused pain.  He experienced more pain turning to the right and became dizzy when he lifted his head up or put his chin down.  The dizziness lasted 15 to 20 minutes.  The pain in his neck went down into his shoulders all the way to his fingers  three to four times a day.  The radiating pain lasted 30 minutes to an hour each time.  Bell lay down, sat, or took medication when this radiating pain happened.  R. 39-41.  The radiating pain happened when he turned his head too quickly or moved his head to certain positions.  R. 41.

Bell stated he had no ability to grip objects and dropped objects "a lot."  R. 41.  His hands trembled due to nerve damage in his neck.  The trembling was worse on the right than the left.  He had numbness in his hands all the time and also cramps in his shoulders.  R. 41-42.

Bell had back pain from his mid back to his tailbone that radiated down his right leg to his ankle.  The radiating pain in the right leg happened three to four times a day and felt like "being electrocuted."  He also had

numbness in his legs if he sat for "[t]wo to three minutes.  Four at the tops."
R. 43.  Bell had shooting pain from his lower back and knee down to his
ankle when he walked.  R. 44.

Bell also testified about his right knee.  He had multiple surgeries on
his right knee and had no flexibility in his right knee and pain in the back
and sides of the knee. R. 44-45.

Bell had a history of broken bones.  He broke his orbital bone in his
face, his hands, and his right ankle.  He stood up during the hearing, and
an audible snapping sound occurred when he stood.  Bell said his
shoulders and knee usually made the snapping sound.  R. 45.

Bell took naps three to four times a day, for an hour to an hour and a
half and he applied ice and heat for his pain three to four times a day.  Bell
sat in a recliner while he applied ice for 30 minutes at a time to his neck
and his knee.  He used a heating pad on his lower back during the day and
when he went to sleep at night.  Bell applied heat during the day for 30
minutes at a time.  R. 46-47.

Bell took Cymbalta for depression and said he had, "Suicidal thoughts
and just depressed."  He did not know if his depression would be resolved if
his physical pains were resolved.  R. 47.  Bell also reported that his
medications made him sleepy.  R. 48.

Bell had difficulty driving because he could not turn his neck to see.
He shifted his body to see his side-view mirrors.  He could ride in a car,
"15, 20 minutes tops."  R. 48.  After 15 to 20 minutes riding in a car, Bell's
back started hurting and his neck felt heavy.  R. 48-49.

Bell did not shop and did not do housework.  He sometimes had
problems dressing himself and wore slip-on shoes or did not tie his shoes if
the shoes had laces.  R. 49.

Bell woke up three to five times a night and sometimes did not sleep
at night at all.  He woke because he had pain, he was thirsty, or he needed
to go to the bathroom.  R. 50.

Bell spent most of his days lying down on a bed or a couch, or
reclining in a recliner.  Occasionally, he walked around for 15 minutes "to
try to loosen up, and then I lay back down."  R. 51.  He could sit in a chair
comfortably for 10 to 15 minutes and could walk half a block.  The heaviest
thing he could lift was a coffee mug.  R. 51.

Vocational expert Myers then testified.  Bell stipulated to her
qualifications to testify as a vocational expert.  R. 53.  The ALJ asked
Myers the following hypothetical question:

> If I asked you to assume a hypothetical individual of the
> claimant's age, education, and work history, with the residual
> functional capacity that allows the individual to work at a
> sedentary exertional level, but with certain limitations: They

would stand for no more than four hours in a workday; but never climb ladders, ropes, or scaffolds or be exposed to unprotected heights or hazardous work environments. They would occasionally climb stairs or ramps; would occasionally stoop, twist, or crouch, but never kneel or crawl; but need to avoid exposure to extreme cold and avoid concentrated exposure to vibration; could occasionally reach overhead.  And that ends the first hypothetical.

R. 55.  Myers opined that the person described in the hypothetical could not perform Bell's prior work as a bartender.  Myers opined that such a person could perform some sedentary jobs in the economy such as an addressing clerk, with 21,500 such jobs in the national economy; and document preparer, with 16,500 such jobs in the national economy.   R. 55-56.  The person in the hypothetical could perform these jobs if he was additionally limited to frequent handling.  R. 56.  The person could also perform the jobs described if he had an additional requirement that every 30 minutes, he had to stand for five minutes while remaining on task.  R. 57.

Myers opined that the person described in the hypothetical could not work if he was limited to occasional reaching in any direction.  The person also could not work if he could only sit, stand, or walk for two hours in an eight-hour workday.  R. 56-57.  The person could not work if he missed two or more days of work per month.  The person also could not work if he needed more than five breaks each day or he needed to lie down at work.

R. 59-60.  If, every 30 minutes,  the person was away from his workstation

for five minutes, the person could not work.  R. 62.  The hearing concluded.

## THE DECISION OF THE ALJ

On October 18, 2017, the ALJ issued her decision.  The ALJ followed

the five-step analysis set forth in Social Security Administration Regulations

(Analysis).  20 C.F.R. §§ 404.1520, 416.920.  Step 1 requires that the

claimant not be currently engaged in substantial gainful activity.  20 C.F.R.

§§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to have a

severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If true, Step 3

requires a determination of whether the claimant is so severely impaired

that he is disabled regardless of his age, education and work experience.

20 C.F.R. §§ 404.1520(d), 416.920(d).  To meet this requirement at Step 3,

the claimant's condition must meet or be equal to the criteria of one of the

impairments specified in 20 C.F.R. Part 404 Subpart P, Appendix 1

(Listing).  20 C.F.R. §§ 404.1520(d), 416.920(d).  If the claimant is not so

severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to his prior work

considering his age, education, work experience, and Residual Functional

Capacity (RFC).  20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f).  If

the claimant cannot return to his prior work, then Step 5 requires a

determination of whether the claimant is disabled considering his RFC, age, education, and past work experience.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g), 416.960(c).  The claimant has the burden of presenting evidence and proving the issues on the first four steps.  The Commissioner has the burden to produce evidence on the last step; the Commissioner must present evidence that, considering the listed factors, the claimant can perform some type of gainful employment that exists in significant numbers  in the national economy.  20 C.F.R. §§ 404.1512, 404.1560(c); Weatherbee v. Astrue, 649 F.3d 565, 569 (7th Cir. 2011); Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005).

The ALJ found that Bell met his burden at Steps 1 and 2.  He had not engaged in substantial gainful employment since August 1, 2013, and he suffered from the severe impairments of degenerative disc disease of the lumbar spine, status post bilateral knee surgeries, and status post spinal fusion surgery.  R. 15.  The ALJ found Bell's depression and anxiety were non-severe impairments.  R. 16.  The ALJ found that Bell failed to present evidence of a medical source that showed that he had a medically determinable impairment of migraine headaches.  No doctor or other acceptable medical source had ever diagnosed migraines and the related symptoms to which Bell testified.  Bell also did not list migraines on his

Disability Report forms.  R. 17.  The ALJ also found that his claims of

memory impairments  were not medically determinable impairments

because he only mentioned memory problems once, to Dr. Batra on June

9, 2014, and not elsewhere, and Dr. Batra's diagnosis that day only relied

on Bell's report.  R. 17.

The ALJ concluded at Step 3 that Bell's impairments or combination

of impairments did not meet or equal a Listing.  R. 17-18.

Before reaching Step 4, the ALJ found that Bell had the following

RFC:

> After careful consideration of the entire record, the undersigned
> finds that the claimant has the residual functional capacity to
> perform sedentary work as defined in 20 CFR 404.1567(a)
> except he cannot stand for no more than 4 hours in a workday;
> never climb ladders, ropes or scaffolds or be exposed to
> unprotected heights or hazardous work environments;
> occasionally can climb stairs or ramps; occasionally can stoop,
> twist, crouch but never kneel or crawl; must avoid exposure to
> extreme cold and avoid concentrated exposure to vibration;
> occasionally can perform overhead reaching and frequent
> handling; and, must stand for 5 minutes every 30 minutes while
> remaining on task.

R. 18.  Sedentary work generally requires lifting a maximum of 10 pounds

and standing or walking for a total of two hours in an eight-hour workday.

20 C.F.R. § 404.1567(b); SSR 83-10, 1983 WL 31251, at *6 (1983).

The ALJ relied on the fact that Bell worked as a roofer, a truck driver,

and a furniture mover in 2015 and 2016 as evidence to support the RFC

finding.  The ALJ relied on the 30-40 pound lifting limit at the April 2016 follow up examination after his neck surgery.  The ALJ relied upon Dr. Crickard's February 2017 examination after Bell's knee arthroscopy in which Bell said that his knee never felt better and Bell had full strength and range of motion in both knees without any pain. The ALJ also relied on examinations that found a steady gait and intact upper extremity strength. The ALJ acknowledged examinations that showed pain and other limitations in strength and range of motion.  The ALJ found that the restrictions in the RFC to a limited range of sedentary work addressed those limitations.  R. 18-20.

The ALJ found that Bell's testimony was inconsistent with the medical records.  The ALJ noted that Bell testified that he could only sit for two or three minutes but sat through the entire hearing without difficulty.  The ALJ also found his work as a roofer, truck driver, and furniture mover were inconsistent with his testimony.  R. 20.

The ALJ gave little weight to Drs. Mack and Gawo's opinions to the extent he said that they indicated Bell could lift 20 pounds occasionally and 10 pounds frequently, which is indicative of light work.  The ALJ found that Bell's impairments limited him to a limited range of sedentary work.  The

ALJ gave some weight to the postural limitations imposed by Dr. Gawo.  R. 20.

The ALJ gave no weight to limitations imposed by Dr. Dedes after the lumbar epidural steroid injection in 2013 and by nurse practitioner Arnold after Bell's neck surgery in July 2016 because those opinions reflected temporary restrictions while Bell recuperated.  R. 20-21.

The ALJ gave little weight to Dr. Batra's June 2017 opinions.  The ALJ found her opinion that Bell could not climb ladders to be supported by Bell's limp, his multiple knee surgeries, and the tenderness on his knee. The ALJ rejected her opinions that he could lift more than 10 pounds to be inconsistent with examination findings of normal upper body strength.  The ALJ found the opinion that he could not stand and/or walk for more than two hours to be inconsistent with the medical examination findings that he had full lower body strength and a steady gait.  The ALJ also found this opinion to be inconsistent with the evidence that he worked as a roofer, truck driver, and furniture mover.  The ALJ also noted that Bell could sit through the hearing that lasted 40 minutes without difficulty.  The ALJ found that Dr. Batra's postural limitations were inconsistent with his work history as a roofer, truck driver, and furniture mover and inconsistent with medical examinations, particularly the December 2016 examination by Dr. Wells

that found 5/5 upper and lower extremity strength, no sensory deficits, and negative straight leg testing bilaterally.  The ALJ found Dr. Batra's opinion that Bell would be off task 25 percent or more of the time to be inconsistent with the various mental status examinations and his work history.  R. 21.

The ALJ concluded at Step 4 that Bell could not return to his prior work.  The ALJ found at Step 5 that Bell could perform a significant number of jobs that existed in the national economy.  The ALJ relied on the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, and the opinions of vocational expert Myers that a person with Bell's age, education, work history, and RFC could perform sedentary jobs such as addressing clerk and document preparer.  The ALJ concluded that Bell was not disabled.  R. 22-23.

Bell appealed.  On January 8, 2019, the Appeals Council denied his request for review.  The decision of the ALJ then became the final decision of the Defendant Commissioner.  R. 1.  Bell then filed this action for judicial review.

## ANALYSIS

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate"

to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971).

This Court must accept the findings if they are supported by substantial

evidence and may not substitute its judgment or reweigh the evidence.

Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003); Delgado v. Bowen, 782

F.2d 79, 82 (7th Cir. 1986).  This Court will not review the ALJ's evaluation

of statements regarding the intensity, persistence, and limiting effect of

symptoms unless the evaluation is patently wrong and lacks any

explanation or support in the record.  See Pepper v. Colvin, 712 F.3d 351,

367 (7th Cir. 2014); Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008);

2017 WL 5180304, AT *1 (October 25, 2017) ( originally issued at 2016 WL

1119029, at *1 (March 24, 2016)) (The Social Security Administration no

longer uses the term credibility in the evaluation of statements regarding

symptoms).  The ALJ must articulate at least minimally her analysis of all

relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).

The ALJ must "build an accurate and logical bridge from the evidence to his

conclusion."  Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ's decision is supported by substantial evidence.  The

medical examinations, particularly Dr. Leung's 2015 consultative

examination, nurse practitioner Arnold's April 2016 and July 2016

examinations, Dr. Wells' December 2016 examination, Dr. Batra's February

2017 examination, and Dr. Crickard's February 2017 examination, found
sufficient strength, mobility, and dexterity to support the ALJ's findings of a
limited range of sedentary work.  Bell's representations to Drs. Batra and
Leung, as well as his representation to nurse practitioner Arnold, that he
worked in 2015 and 2016 as a roofer, furniture mover, and truck driver also
supported the ALJ's findings that he could at least perform a limited range
of sedentary work.  Bell's February 2017 report that his knee was never
better after the 2017 surgery also supported his finding.

The ALJ was correct that Bell's testimony was inconsistent with his
own reports to health care professionals that he worked as a truck driver,
roofer, and furniture mover.  The ALJ also observed that Bell's ability to sit
through the hearing was inconsistent with his testimony that he could only
sit for two or three minutes at one time.  The ALJ may rely on her
observations of the claimant in rendering her decision.  See Powers v.
Apfel, 207 F.3d 431, 436 (7th Cir. 2000).  This evidence constitutes
substantial evidence to support her findings.

The ALJ explained adequately how Dr. Batra's June 2017 opinions
were inconsistent with evidence in the record.  The record evidence cited
by the ALJ, and described above, is substantial evidence to support her
treatment of the opinion.

As a result, the RFC finding was supported by substantial evidence. The RFC and the opinions of vocational expert Myers supports the decision at Step 5 that Bell could perform a significant number of jobs in the national economy.  The decision was supported by substantial evidence.

Bell argues that the ALJ erred in her evaluation of Dr. Batra's opinions.  The ALJ must give the opinions of a treating physician controlling weight if the opinions are supported by objective evidence and are not inconsistent with other evidence in the record.  20 C.F.R. § 404.1527(d)(2); Bauer v. Astrue, 532 F.3d 606, 608 (7th Cir. 2008).[4]  If the opinion is not given controlling weight, the ALJ must evaluate the opinion in the same manner as the opinion of a non-treating physician.  See 20 C.F.R. § 404.1527.  Bell complains that the ALJ did not address the factors for opinions of non-treating physicians, specifically the longevity of the relationship.  The ALJ is not required to mention each listed factor as long as she minimally articulated good reasons for discounting the doctor's opinions.  See Elder, 529 F.3d at 415-16; Henke v. Astrue, 498 F.Appx. 636, 640 n.3 (7th Cir. 2012); Cherry v. Commissioner of Social Security,

---

[4] The Commissioner changed the regulations regarding the interpretations of medical evidence.  The amendments, however, apply prospectively to claims filed on or after the amendment's effective date of March 27, 2017. Revisions to Rule Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, at 5844-45 (January 18, 2017).  As such, the amendments do not apply here.

2014 WL 3638855, at *3 (C.D. July 23, 2014).  Here, the ALJ adequately explained the basis for her treatment of Dr. Batra's opinions and cited good reasons for her decision from Bell's medical records.  The Court sees no reversible error.

Bell quotes extensively from the case of <u>Brown v. Colvin</u>, 845 F.3d 247, 253 (7th Cir. 2016) to support his argument regarding the ALJ's treatment of Dr. Batra's opinions.  The Seventh Circuit in <u>Brown</u> criticized the ALJ's treatment of the physician's opinion in Brown because the ALJ did not cite any evidence that contradicted the opinions of the physician. <u>Brown</u>, 845 F.3d at 253.  Here, the ALJ cited contradictory evidence.  The ALJ cited evidence that Bell had full strength in his upper extremities and full grip strength from his medical examinations as contradicting the opinion that Bell could not lift 10 pounds.  The ALJ cited Bell's reports to health care providers that he worked as a roofer, furniture mover, and truck driver as contradicting many of Dr. Batra's other opinions.  The ALJ cited the mental status examinations that repeatedly showed intact speech, thought processes, and judgment as contradicting the opinion that Bell would be off-task 25 percent of the time or more.  The ALJ cited contradictory evidence.  The <u>Brown</u> opinion does not apply.

Bell complains that the ALJ improperly relied on the "sit and squirm"
test to support her decision.  Bell cites <u>Powers v. Apfel</u>, 207 F.3d 431, (7th
Cir. 2000).  The "sit and squirm" test refers to the ALJ's observation that
Bell said he could sit for only two to three minutes, but the ALJ observed
Bell sit through his hearing which lasted more than 40 minutes.  The
<u>Powers</u> Court questioned the value of noting that a claimant could sit at the
hearing for longer than claimed in the testimony.  The <u>Powers</u> Court,
however, agreed that the ALJ could consider the observations of the
claimant in the hearing in making her determination:

> Finally, the hearing officer considered Powers' statement that
> she could not sit for more than ten minutes without severe pain
> to be inconsistent with his observation of her during the
> hearing, at which she sat for far longer than ten minutes,
> apparently without signs of discomfort.  Many courts have
> condemned the "sit and squirm" test, and we are uncomfortable
> with it as well.  We doubt the probative value of any evidence
> that can be so easily manipulated as watching whether
> someone *acts* like they are in discomfort.  However, we note
> that even those courts cited by Powers as opposing the "sit and
> squirm" test endorse the validity of a hearing officer's
> observations of the claimant.  Likewise, we have repeatedly
> endorsed the role of observation in determining credibility and
> refuse to make an exception in this situation. The hearing
> officer had an opportunity to observe Powers for an extended
> period of time and could gauge whether her demeanor,
> behavior, attitude and other characteristics suggested
> frankness and honesty and were consistent with the general
> bearing of someone who is experiencing severe pain.

Powers, 207 F.3d at 436 (internal citations omitted).   The ALJ, therefore, could consider Bell's behavior at the hearing in making her decision.  The ALJ also did not rely only on how long Bell sat at the hearing.  The ALJ relied on other evidence, as discussed above, to evaluate Dr. Batra's opinion.  The treatment of the opinion was supported by substantial evidence as discussed above.   There was no error.

Bell next complains that the ALJ erred in relying on his representations to Drs. Batra and Leung, and nurse practitioner Arnold that he worked in 2015 and 2016 as a roofer, truck driver, and furniture mover. The Court sees no error.  The ALJ can properly rely on the reports that a claimant makes to his health care professionals as recorded in his medical records.  See e.g., 20 C.F.R. § 404.1513(a)(1) and (2) (the Social Security Administration will consider information in medical records in evaluating disability claims).  The ALJ's reliance on these records was not error.

Bell notes that his Social Security FICA records reflect no reported earnings in 2014 and 2015.  That may be true, but Bell reported that he worked in these jobs.  The ALJ was entitled to rely on Bell's representations to his medical providers.  Those representations are substantial evidence.  Bell argues that the ALJ misinterpreted the records.

The Court again disagrees.  The ALJ reasonably interpreted the statements in the records. The Court sees no error.

THEREFORE, IT IS ORDERED that Defendant Commissioner's Motion for Summary Affirmance (d/e 19)  is ALLOWED, Plaintiff Terrell Bell's Brief in Support of Motion for Summary Judgment (d/e 14), is DENIED, and the decision of the Defendant Commissioner is AFFIRMED. All pending motions are denied as moot.  THIS CASE IS CLOSED.

ENTER:   July 8, 2020.


_____ s/ *Tom Schanzle-Haskins*_____

TOM SCHANZLE-HASKINS
UNITED STATES MAGISTRATE JUDGE